# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **FRANKLIN GRAY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. CIV-11-189-JHP-SPS |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of the Social** ) | |
| **Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

The claimant Franklin Gray requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). He appeals the Commissioner's decision and asserts the Administrative Law Judge ("ALJ") erred in determining he was not disabled. For the reasons set forth below, the Commissioner's decision should be REVERSED and the case REMANDED to the ALJ for further proceedings.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy[.]" *Id.* § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts

---

[1] Step One requires the claimant to establish that he is not engaged in substantial gainful activity. Step Two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied. If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity ("RFC") to return to his past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). *See also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was born May 8, 1946, and was sixty-two years old at the time of the most recent administrative hearing, but was forty-six years old on his date last insured. (Tr. 89, 1188-1189). He completed his GED (Tr. 127), and has worked as a saw operator, welder, fitter, helper, jackhammer operator, and a bus boy (Tr. 1219). The claimant alleged that he has been unable to work since April 24, 1990, due to breathing problems, high blood pressure, high cholesterol, post-traumatic stress disorder (PTSD), and depression. (Tr. 117, 121).

## Procedural History

On June 6, 2003, the claimant protectively applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434 (Tr. 106-110), for a period of disability beginning April 24, 1990, with a date last insured of December 31, 1992. His application was denied. ALJ Jennie L. McLean conducted an administrative hearing and determined that the claimant was not disabled in a written opinion (not available in the transcript) dated July 28, 2006. The Appeals Council remanded the proceedings, and ALJ McLean held another administrative hearing and determined that the claimant was not disabled in a written opinion dated January 27, 2009. (Tr. 16-25). The Appeals Council then denied review, and the ALJ's January 2009 written opinion became the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. § 404.981.

**Decision of the Administrative Law Judge**

The ALJ made her decision at step five of the sequential evaluation. She found that the claimant had the residual functional capacity (RFC) to perform a full range of medium work, *see* 20 C.F.R. § 404.1567(c), except that he was limited to simple repetitive work with no contact with the public and no customer service. The ALJ specifically noted that the claimant was able to do frequent overhead reaching with his left upper extremity. (Tr. 20). The ALJ concluded that, although the claimant could not return to his past relevant work, he was nevertheless not disabled because there was work he could perform in the regional and national economies, *e. g.*, press machine operator, automatic machine attendant, and vault worker. (Tr. 15).

**Review**

The claimant contends that the ALJ erred by: (i) failing to properly assess his RFC as to his mental *and* physical impairments, (ii) by finding that there was other work he could do, and (iii) improperly assessing his credibility. The Court finds the ALJ *did* make a number of errors at step four, and the decision of the Commissioner should therefore be reversed.

The ALJ found that the claimant had the severe impairments of left shoulder pain due to a gunshot wound and PTSD. (Tr. 19). The claimant has submitted an extensive medical record and transcript. He served two tours of duty in Vietnam between 1965 and 1971. While serving in Vietnam, he received a gunshot wound to his left shoulder. He was discharged in 1971. The claimant reported that in 1971 he had a "nervous breakdown. . . . I guess I was shooting the place up, everyone looked like the Viet Cong,"

that he was first jailed, then psychiatrically hospitalized, but was then given a general discharge, and referred to psychiatric treatment but did not seek it. (Tr. 552). VA records from 1975-1976 reveal that the claimant sought treatment for headaches, pain in his shoulder and back, and episodes of irrational and violent behavior. (Tr. 923-935). In November 1975, the claimant reported that he had been experiencing blackouts and violent behavior including destroying property and shooting "at his wife for no apparent reason," experiencing déjà vu, smelling something "dead" that other people cannot smell, memory issues, and racing thoughts. The claimant was frightened by his own behavior and sought help, and doctors evaluated him for neurological problems and a seizure disorder in light of his shrapnel injuries in/near his head, but the test results were negative. He was prescribed phenobarbital and Dilantin, and reported doing well on his medications; in August 1976 a doctor wrote "seizure disorder v. dissociative episodes controlled." The claimant also continued to complain of pain in his back, shoulder, and arms from the shrapnel. In September 1976, a doctor noted that the claimant reported no further violent spells and was working full time. As to his medications, the doctor's plan stated that the claimant was to "(1) Continue [phenobarbital] 30mg prn (2) d/c Dilantin (3) Rationale for continuing [phenobarbital] is primarily to effect a psychologic change which may protect his family & furniture, etc." (Tr. 923-935). The claimant testified that he was sentenced to four years in the federal penitentiary in the early 1980s, because he "shot a guy once." (Tr. 1137-1139, 1202-1203).

Oklahoma VA Records from the relevant insured period reveal that the claimant was treated in the Hyptertension Clinic in February 1991, where the claimant reported

that he knew when his blood pressure was high because he would get headaches and be dizzy. The Physician's Assistant noted that his medication refill pattern indicated he was not compliant with his medications. (Tr. 690). Notes from the Mental Health Clinic on March 4, 1991 state that the claimant reported he was "not too good," and was having nightmares and other problems. The claimant denied drinking, but stated that he had war dreams, and would get forgetful and depressed, and had sleep problems. The doctor noted that the claimant was coherent, not in danger to himself or others, but was rambling, had ideas of persecution, and noted "?Paranoia, Somatic." (Tr. 689). The Doctor diagnosed him with PTSD/schizoaffective disorder, and recommended a neurological consult. (Tr. 689). Further notes from the mental health clinic indicated the claimant reported that he could recall his Vietnam experience like it was yesterday, that he had started a PTSD program through the VA in Colorado but dropped out before completing it, that he coped by "acting out" his feelings or through denial, but that it had "become more difficult to deal with his problems & he find[s] himself having [increased] guilt, feelings of betrayal, sense of loss, nightmares/insomnia, & fears that he will be abandoned because people seem afraid of him/he has not learned how to overcome the problems which he experiences in interpersonal relationships. He complained of [increased] fear because he had some notions of suicide recently. However, he indicated that he did talk with primary provider about his recent suicidal thoughts/denied having present preoccupation with such thoughts." (Tr. 683-684). The note indicated that the claimant was going to be referred to the Vietnam Vet Center for participation in a PTSD program, but that it was impaired by problems with travel. (Tr. 684). Mental Health

record notes from September 1991 state there was no change and that the claimant reported feeling "so-so." (Tr. 680). Notes from the orthopedic clinic in October 1991 indicate that the claimant had a history of chronic low back pain, as well as neck and left shoulder pain, and that residual shrapnel was likely causing the left shoulder pain. (Tr. 679). After several months of follow-up treatment for his left shoulder pain, he was referred to general surgery for extraction of the bullet in his left axillary area, but later medical notes indicate surgery was not recommended at that time. (Tr. 673, 670). On September 10, 1992, the claimant reported to the Mental Health Clinic that he was feeling the same. (Tr. 668).

In the mid- to late 1990s, the claimant's medical records note his PTSD diagnosis, complaints of pain, and polysubstance abuse of alcohol and cocaine. (*e. g.*, 573). Although not part of the transcript in this case, the claimant was apparently hospitalized for fourteen days in 1999 following a suicide attempt. (Tr. 405). Additionally, he was enrolled in treatment programs for substance abuse and PTSD treatment numerous times between 2000 and 2007, both inpatient and outpatient. While he was beginning a treatment program in 2001, his daughter (and only child) was murdered and in 2002 he enrolled in and completed a PTSD program. (Tr. 585). In 2007, the claimant was hospitalized for suicidal thoughts after he presented to the ER with chest pains and suicidal ideations, and was noted to be "actively using cocaine." (Tr. 1025).

In July 2003, a state reviewing physician completed a physical RFC assessment finding that the claimant could do medium work, but that the claimant should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards due to

his emphysema/bronchitis and seizure activity. (Tr. 169). A state reviewing physician also completed a Psychiatric Review Technique on July 21, 2003, finding that the claimant did not have a severe impairment. The physician found that the claimant had mild limitations and no episodes of decompensation. The physician noted that the claimant alleged PTSD, that records indicated an allegedly ongoing treatment, and that there "may" be some history of alcohol abuse but that the claimant's mental status on visits to the VA was normal. (Tr. 183-185)

At a September 28, 2005 administrative hearing, the claimant testified that he last used illegal drugs "six or seven years" previously, and that he still occasionally drank alcohol. (Tr. 1146). In response to questioning from his attorney, the claimant testified that during the relevant insured period he experienced flashbacks and nightmares, could not be around people, had difficulty sleeping, and that he coped by retreating to the woods or other places where he could be alone. He explained that he did this because "That a way I ain't got no problems. I'm not going to hurt you and you're not going to hurt me, see. I don't have to worry about hurting nobody, you see what I'm saying? That's it." (Tr. 1157-1158). The attorney asked the claimant if he had gotten better or worse "or what" since the relevant insured period, and the claimant stated that he was "about the same," and that he was more afraid of himself than other people. (Tr. 1159). He explained that after Vietnam, he carried a gun for fourteen years because he did not feel safe without it, and that psychiatrists at the VA helped him to stop wearing it in the mid-1980s and he had not shot anyone since that time. (Tr. 1160-1161). He stated that when he tried to work, his employers knew of his problems and "kind of put up with me

so I could work, you know, try to work." (Tr. 1162). He reported that he would have problems when his boss would "hound" him to do something over again, and he struggled with his anger. (Tr. 1162-1164). He testified that he drank and did drugs in order to "kill the pain . . . You know, that's better than taking a pistol and blowing your brains out. I even tried that once and that didn't work." (Tr. 1164). At the administrative hearing on August 21, 2008, the ALJ and attorney began questioning the claimant about the relevant time period and any mental or emotional problems during that time. The attorney noted that the claimant appeared to be having a flashback, and the claimant stated that he could not sleep at night, then referred to his daughter's 2001 murder. (Tr. 1204-1205). Upon further questioning from his attorney, the claimant stated that he was angry, that he would avoid people and still does that, that he was frightened about people, and that at night he would "check the parameter" to make sure he was secure. (Tr. 1205-1206). The claimant's sister also testified, stating she didn't recall exactly where the claimant lived during the relevant insured period but that he went back and forth between Colorado and Oklahoma, that he could not be around people a lot and would retreat into the woods, that he was like a different person when he came back from Vietnam, that he did not deal well with other people and could not handle a lot of stress, and that he complained of pain in his left arm and leg. (Tr. 1215-1218).

In her written opinion, the ALJ summarized the hearing testimony of the claimant and his sister, as well as some of the medical evidence. At step two, the ALJ noted that the claimant was given a 50% service-connected disability for PTSD, impaired hearing, and scarring. The ALJ also noted that the assessment of "dissociative disorder v. seizure

-9-

disorder" was not probative or relevant because it was fifteen years prior to the insured period. (Tr. 19). The ALJ found that both the claimant and his sister's testimony were not limited to the time period in question or were vague as to the time reference, and the ALJ gave little weight to the claimant's sister's testimony because it was not limited to the time period in question. (Tr. 21). The ALJ specifically gave no probative value to the records from 1975-1976 because the claimant maintained significant gainful activity after that time. (Tr. 21). The ALJ noted the alleged onset date of April 24, 1990, but notes that the first records subsequent to the alleged onset date began February 25, 1991. (Tr. 22). As to the mental health records from that time, the ALJ noted that the claimant denied major problems in September 1991 and again in August 1992 and December 1992. (Tr. 22). The ALJ noted the 2003 state examiner's physical RFC assessment, but not the additional limitations of avoiding concentrated exposure to fumes and other hazards. (Tr. 22). As to the mental PRT form, the ALJ noted that the reviewer did not document the medical evidence used to reach the assessment and that there did not appear to be substantive evidence in the record. (Tr. 23).

The claimant alleged an onset of disability on April 24, 1990, and his insured status expired on December 31, 1992, and the ALJ determined that the claimant did not become disabled during the relevant insured period. (Tr. 24-25). Claimant's attorney twice requested that the ALJ allow a psychologist to conduct a consultative examination of the claimant and to testify at the hearing because the claimant "had cut himself off from society to an extent and did not have a lot of treatment early in his condition," but the ALJ denied these requests. (Tr. 163-164). "With slowly progressive impairments, it

is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. . . . In such cases, it [is] necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process." Soc. Sec. Rul. 83-20, 1983 WL 31249, at *2. "[T]he [ALJ] should call on the services of a medical advisor when onset must be inferred." *Id.* at *3. "[T]he issue of whether the ALJ erred by failing to call a medical advisor turns on whether the evidence concerning the onset of [the claimant's] disabilities was ambiguous, or alternatively, whether the medical evidence clearly documented the progression of his conditions." *Blea v. Barnhart*, 466 F.3d 903, 912 (10th Cir. 2006). *See also Reid v. Chater*, 71 F.3d 372, 374 (10th Cir. 1995) ("[A] medical advisor need be called only if the medical evidence of onset is ambiguous."); *Bailey v. Chater*, 68 F.3d 75, 79 (4th Cir. 1995) ("In the absence of clear evidence documenting the progression of [the claimant's] condition, the ALJ did not have the discretion to forgo consultation with a medical advisor."). An ambiguity in the evidence is only an issue if it involves the possibility that the onset date was prior to the expiration of insured status. *See Hill v. Astrue*, 289 Fed. Appx. 289, 294 (10th Cir. 2008) ("Expert testimony is helpful where the ALJ has determined that the claimant eventually became disabled but there is some ambiguity about whether the onset of this disability occurred prior to the expiration of the claimant's insured status."), *citing Blea*, 466 F.3d at 913.

Under Soc. Sec. Rul. 83-20, the ALJ was not required to seek the assistance of a medical advisor unless the medical evidence was ambiguous. But the ALJ specifically noted the absence of records between the alleged onset date of April 24, 1990 and

February 25, 1991, and faulted the claimant for not seeking treatment earlier. But the evidence shows that the claimant's isolation and lack of treatment could have been the result of his severe mental impairment rather than an indication that the claimant did not need treatment, which lends credence to the presence of ambiguities. *See Blea*, 466 F.3d at 912-13 ("Mr. Blea's medical record is indisputably incomplete during a pertinent time period, June to December 1998. But, rather than call[ing] on the services of a medical advisor when onset must be inferred, the ALJ made negative inferences against Mr. Blea due to the gap in the medical record. An ALJ may not make negative inferences from an ambiguous record; rather, [he] must call a medical advisor pursuant to [Soc. Sec. Ruling] 83-20."), *citing* Soc. Sec. Rul. 83-20, 1983 WL 31249, at *3 and *Reid*, 71 F.3d at 374 [internal quotations omitted]. The medical evidence during the relevant insured period is admittedly sparse, but does show that the claimant was provided with information on applying for disability based on his PTSD during the relevant insured period (Tr. 688), that the claimant would retreat into the woods alone for extended periods of time because he did not like to be around people, and that he was seeking treatment for pain in his shoulder that was treated conservatively because the claimant believed that the risks of surgery outweighed the possible benefits (Tr. 669). "[W]ith respect to the onset date of a disability, . . . an ALJ 'may not make negative inferences from an ambiguous record; rather, it must call a medical advisor pursuant to SSR 83-20." *Bigpond v. Astrue*, 280 Fed. Appx. 716, 717-18 (10th Cir. 2008) ("[T]he issue of whether the ALJ erred by failing to call a medical advisor turns on whether the evidence concerning the onset of [the claimant's] disabilities was ambiguous, or alternatively, whether the medical

evidence clearly documented the progression of his conditions.'"), *quoting Blea*, 466 F.3d at 912. Thus, the ALJ should have called upon a medical advisor to infer the onset of the claimant's disability. *See Blea*, 466 F.3d at 912 ("[T]he issue of whether the ALJ erred by failing to call a medical advisor turns on whether the evidence concerning the onset of [the claimant's] disabilities was ambiguous, or alternatively, whether the medical evidence clearly documented the progression of his conditions."). *See also Bailey v. Chater*, 68 F.3d 75, 79 (4th Cir. 1995) ("In the absence of clear evidence documenting the progression of [the claimant's] condition, the ALJ did not have the discretion to forgo consultation with a medical advisor.").

Further, the ALJ simply stated at step two that the claimant was drawing service-connected benefits in 2000, with a 50% rating due to PTSD, impaired hearing, and scarring, and made no further mention of the VA disability rating, including a note form the VA records made on March 11, 1991 indicating that the claimant was seeking an evaluation for a PTSD disability evaluation with the military during the relevant insured period. (Tr. 688). The ALJ thus erred at step four when she did not even discuss the claimant's VA disability rating. *Baca v. Department of Health & Human Services*, 5 F.3d 476, 480 (10th Cir. 1993) ("'Although findings by other agencies are not binding on the Secretary, they are entitled to weight and must be considered.'"), *quoting Fowler v. Califano*, 596 F.2d 600, 603 (3d Cir. 1979). *See also Kanelakos v. Astrue*, 249 Fed. Appx. 6, 8 (10th Cir. 2007) ("[T]he ALJ mentioned the VA rating and appropriately stated that the SSA and VA standards differ. But he completely 'fail[ed] to discuss the significance of the VA's disability evaluation.'") [unpublished opinion], *quoting Grogan*

*v. Barnhart*, 399 F.3d 1257, 1262-1263 (10th Cir. 2005) ("Although another agency's determination of disability is not binding on the Social Security Administration, 20 C.F.R. § 416.904, it is evidence that the ALJ must consider and explain why he did not find it persuasive."), *citing Baca*, 5 F.3d at 480.

Because the ALJ failed to properly conduct a step four analysis, the decision of the Commissioner should be reversed and the case remanded to the ALJ for further analysis. If such analysis results in any adjustments to the claimant's RFC, the ALJ should re-determine what work the claimant can perform, if any, and ultimately whether he is disabled.

## Conclusion

The undersigned Magistrate Judge hereby PROPOSES a finding by the Court that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. The undersigned Magistrate Judge thus RECOMMENDS that the Court reverse the decision of the Commissioner and remand the case for further proceedings. Any objections to this Report and Recommendation must be filed within fourteen days. *See* Fed. R. Civ. P. 72(b).

**DATED** this 10th day of September, 2012.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma